### 11764, 11843.  SMITH *v.* PAYNE, agent, *et al.*

The evidence for the plaintiff failed to support the allegations of negligence made against the defendant carrier, in respect to the tank-car of gasoline, the explosion of which was alleged to have caused the death of the plaintiff's son; and a nonsuit was proper as to that defendant.

DECIDED APRIL 14, 1921.

Action for damages; from city court of Atlanta — Judge Reid. June 8, 1920.

Mrs. E. S. Smith sued the Director-General of Railroads, the Western & Atlantic Railroad Company, and the Reed Oil Company, for damages on account of the homicide of her minor son, Zion Smith, she being a widow.  On demurrer the court struck the Western & Atlantic Railroad Company as a defendant, and the case proceeded to trial against the Director-General and the Reed Oil Company upon substantially the following allegations: Some time prior to February 12, 1918, the Director-General of

Railroads, operating the Western & Atlantic Railroad, received two cars, C. O. S. X. 1470 and C. O. S. X. 1459, for delivery to the Reed Oil Company in Atlanta, the former car being filled with liquefied petroleum gas, or casing head gas, which is an exceedingly unstable fluid, evaporating and disintegrating rapidly, throwing off fumes at a very low temperature, to wit, 80 degrees F., and the vapors which emanate from it being exceedingly combustible, and, when escaping, easily carried by the winds one hundred yards or more. On said date one Thomas maintained a vulcanizing plant in a brick house almost entirely open at the rear and in which at all hours of the day an open furnace was kept going; which the defendants knew or in the exercise of ordinary care ought to have known. Immediately in the rear of this building the said carrier maintained tracks, the nearest of the tracks being about five feet from the southern end of the building, and over these tracks was accustomed to move cars. At or about 5:30 o'clock p. m. on said date the petitioner's son was in the Thomas plant on business, and while there was killed by the explosion of the fumes emanating from a tank-car, the property of the defendant oil company and in the possession of the carrier. This tank-car, on the day preceding the explosion and on the day of the explosion, was emitting fumes from its valves; which was an evidence of the disintegration of the liquid therein and of great interior pressure. About 6 o'clock a. m. of that date this tank-car was placed by the carrier on the track nearest the rear of said building, so that it stood within five feet of the rear end of the building and with the dome of the car immediately opposite the open way leading into the plant. While in this position the mixture in the car rapidly vaporized, and the vapors began to collect in the car and were constantly seeking avenues of escape, which the defendants knew or by the exercise of ordinary care should have known. About five o'clock p. m., February 12, 1918, Hyde, as agent and employee of the Reed Oil Company, acting under instructions from its president, went upon said tank-car and unscrewed the dome cover. Before doing this he made no test to ascertain the absence of vapor in the car. Such a test should have been made by a safety valve on the car for that purpose. By the removal of the dome cover a large quantity of vapor was emitted, and was carried by the winds in to the plant of Thomas

and to the open furnace maintained therein, and the explosion resulted.

It is alleged that in the unscrewing and removing of the dome cover Hyde was acting within the scope of his employment by the oil company and under the order of its president, Reed, who instructed Hyde to get a sample of the liquid in the car. The oil company by its agent Hyde, in failing to make the test by means of the safety valve to ascertain the absence or presence of vapor pressure, violated a rule of the interstate commerce commission, which the petition sets forth. Upon the tank-car were red labels to apprize one of the danger of its contents, as required by the rules of the interstate commerce commission. These red labels contained the following reading matter: " Notice to Railway Employees. Caution. Keep away from fire, stoves, radiators, lighted matches, lanterns and direct sunlight. Any leaking package must be removed to a safe place." The car was also placarded, as required by a rule of the commission, with the following inscription: "........Railroad Company. Inflammables. Keep lights and fires away. Handle carefully. ....Station...., 191... 1. This must not be next to a car containing explosives. 2. Do not enter with exposed flame, nor with lighted lantern, until car has been ventilated and vapors allowed to escape." The defendant carrier took no precaution to prevent the explosion, but placed the car immediately in the rear of the Thomas plant without any barrier or guard between the car and the plant, notwithstanding that the plant contained an open furnace in which open fires were then burning and this was contrary to the rule of the interstate-commerce commission providing: " When cars protected by ' Inflammable ' placards are received or held in yards, particularly at night, the carrier must see that all necessary precautions are taken to prevent accidents. These precautions must include provisions for quickly isolating them in case of fire." The oil company had the consent of the carrier to go upon the car, still in the possession and control of the carrier, for the purpose of obtaining samples of the contents of the car.

It is alleged that defendants were negligent in the following particulars: Defendant carrier in placing the tank-car, labelled as aforesaid, and known to contain a highly combustible liquid, which emanated inflammable and dangerous vapors, within a few

feet of the open furnace in said plant, defendant carrier, in so placing the car, knowing that it contained explosives of some kind, and knowing the Thomas plant had in it an open furnace. Defendant carrier in allowing Hyde to take off the dome cover while the car was adjacent to a building containing an open furnace. Defendant oil company in entering upon the premises of the carrier and inspecting the contents of the car before it was delivered by the carrier to the oil company. Both defendants in allowing any one to inspect the contents of the car by unscrewing the dome cap without first ascertaining the absence of vapor pressure in the tank. Both defendants in opening and allowing to be opened the dome of the car containing gas which was known to be exerting a high pressure therein and to be seeking an avenue of escape, without first removing it from the proximity of open fires. Defendant carrier knew or in the exercise of ordinary care should have known that the Reed Oil Company would go upon the car, located as stated, to obtain samples and inspect the contents, notwithstanding which the carrier allowed the car to stand in such close proximity to said furnace, although directed, under the placards thereon, to keep the same away from fire. The defendant carrier took no precaution to prevent the opening of the car for inspection, but placed it as above stated near the Thomas place of business, in which the open fire was burning and from which great heat emanated, contrary to the rule of the Interstate Commerce Commission stated. The defendant oil company had the right to go upon the car to obtain samples and inspect, and the defendant carrier knew this, or in the exercise of ordinary care should have known it.

In support of the foregoing allegations the plaintiff introduced evidence in substance, as follows: The Reed Oil Company, of Atlanta, ordered from H. D. Gray Petroleum Company Shreveport, La., 12 or 15 cars of gasoline, straight run 58° to 60 gravity gasoline. It did not order the substance shipped in the tank-car in question. The contents of that car analyzed and found to contain a mixture of low-grade naphtha and casing-head gasoline. Casing-head gasoline is condensed natural gas liquefied. Ordinary or straight-run gasoline will keep in a tea cup in a cool place and " will not vaporize to speak of." It might lose one to two per cent. in three or four hours. A cupful of casing-head gasoline will vaporize within fifteen or twenty minutes, being very hard to han-

dle; it is light and volatile, two or three times as light and volatile as ordinary gasoline. There would be no danger whatever in placing a car of gasoline, the ordinary commercial kind, such as the Reed Oil Company ordered, in a steel tank-car, in good condition, with its cover on and not leaking, in the neighborhood of a place where there is a fire. There would be no danger whatever in opening a car of straight ordinary gasoline. If the car had been loaded with straight gasoline it would not have gone into the vulcanizing plant. The fumes of gasoline are inflammable and do cause fires. As between ordinary gasoline and casing-head gasoline, the latter, from the standpoint of giving off gases and vapors so as to create danger of any sort, is the more dangerous substance. It would be dangerous to open a receptacle of any kind containing gasoline near an open flame, the danger being that the fumes might be carried into the open flame and cause an explosion. There have been cases where fumes from casing-head gasoline have been carried as far as a thousand feet. Fumes from straight-run gasoline can be carried 25 or 30 feet, if the wind is in that direction. Putting gasoline close to a fire tends to make it evaporate faster. If a car of it is put within five or ten feet of an open furnace and the car opened, it is impossible to say categorically whether this would create gas more rapidly than otherwise; this would depend upon the extent of the fire and the extent of the heat radiating from the fire. It would have to have a good deal of heat to affect a car six feet away. Gasoline vapor is heavier than air and will sink. When it comes into contact with an open flame there may not be an explosion; it all depends. The sun's rays beating down on a car have effect on casing-head gasoline, and tend to increase the pressure, and if a fire were in close proximity to it the effect upon the casing-head gasoline would be to tend to increase the pressure and the degree of vaporization.

February 12, 1918, was a mild day, with a temperature of about 60 degrees. The two cars, 1459 and 1470, were carried from Memphis, Tenn., to Atlanta, Ga., on way-bills wherein the shipments were designated as "Tank Car Gasoline moving from Muscogee, Oklahoma, Jan. 24, from Motor Gas Co. to shipper's order, notify Reed Oil Co., Atlanta, Ga." The way-bills had on them the statement, "Inflammable placards applied," and the word "Inflammable." A draft, with bill of lading attached, was drawn on the

44

Reed Oil Company by the Gray Petroleum Company, for the price of these cars, but was not paid or received by the Reed Oil Company. In the afternoon of and before the explosion, Reed, presi· dent of the Reed Oil Company, in company with Hyde, on Marietta street, Atlanta, saw the car 1470, in the rear of Thomas' place, between Marietta street and the railroad; he had been notified that his order had been filled and car 1470 shipped to his company, and he instructed Hyde to secure samples from it. No one had given Reed permission to go over and get the sample off the railroad tracks. Reed testified: that he sent, because "that has been a custom, to take samples for the State Oil Inspector, for years and years, a good many years. Samples must be taken from each car and turned over to the State oil inspector before it is marketable in the State of Georgia. I have never taken these samples more than a block from the oil plants, may be a block and a half from the oil plants. We get about fifteen to eighteen cars of oil a month. This car was, I suppose, a block, or a block and a half, from the oil plant." Reed testified that he did not know before the explosion that the car contained casing-head gas; if he had known it he would not have sent Hyde to sample it and would not have touched or looked at the car. There was nothing on the placards to indicate that it was other than straight-run gasoline. The car had an inflammable diamond-shaped card upon it, but ordinary cars of gasoline have these. When casing-head gasoline is shipped, there are special placards. These cars in which inflammable substances are shipped are equipped with safety valves to relieve the pressure in case it gets too high for ordinary safety. This car was equipped with two safety valves up on the dome. By means of them a person could have ascertained just what the pressure was in the car and could have ascertained if the pressure had gone to a dangerous point. Thomas was running a vulcanizing plant, and kept a fire in his shop in an upright boiler now and then. The building in which the plant was operated was something like 30 feet long and ran back to six feet from the nearest railroad track. The business of Thomas in the shop was that of vulcanizing automobile tubes and he had a fire there all of the time. He kept it in a stationary boiler. It was just like a stove, it had a door, and the door opened to throw the coal in. The explosion occurred between 3 :30 and 5 :30 o'clock. There was no evi-

dence as to how long the car had been at the rear of the Thomas plant. The body of the plaintiff's son was found inside of the Thomas building. It does not appear how far from the rear door of that building the boiler was located.

The only evidence as to what caused the explosion was that of one witness, who testified that he saw the tank-car in the rear of the vulcanizing building just prior to the accident. There was one white man up on the tank-car, and he was knocking on the top of the tank. The witness could not see what it was he was knocking with. He knocked about two or three minutes and a white steam or vapor shot up from the top of the tank, about 25 feet, and then the explosion ocurred. The man on the car jumped off and ran up the railroad, and the witness put out the fire on the man. The explosion occurred about the same time that the man got off the tank. "I knew the man that was on the car. It was Gordon Hyde. I saw this between 5:30 and 6 o'clock. I was about two hundred feet from the car when the man was knocking it. When the explosion occurred I was about 100 feet from the car, so I had to walk about 100 feet from the time he was knocking on the dome. There are a great many tracks out there." The car itself was not exploded. It burned a little at one end.

The regulations of the interstate-commerce commission relative to the placards, set out in the petition, were introduced in evidence by the plaintiff. Another regulation of the commission was introduced, which is as follows: " The dome cover should be unscrewed by placing a bar between the dome cover and the knob. The dome cover should not be hammered, and should not be unscrewed until the absence of vapor pressure in the tank is verified by lifting the safety valve."

At the conclusion of the evidence introduced by the plaintiff the court sustained a motion to nonsuit as to the Director-General of Railroads, and the case came to this court on exceptions to that judgment.

*Hewlett & Dennis,* for plaintiff.

*Tye, Peeples & Tye, Neufville & Neufville,* for defendants.

HILL, J. (After stating the foregoing facts.) In our opinion the plaintiff failed to sustain the allegations of the petition so far as the alleged negligence of the Director-General of Railroads was concerned, either separately or concurrently with that of the

codefendant, the Reed Oil Company, and therefore the judgment awarding a nonsuit as to the Director-General was correct. The evidence failed to show that the defendant carrier knew that the car contained casing-head gasoline, and there was no circumstance putting the carrier on notice that it contained anything except ordinary commercial gasoline,— the kind that was ordered by the Reed Oil Company and the kind that was shipped in the tank-car, according to the way-bill for the car itself. All the labels on it indicated that it contained ordinary commercial gasoline, for there was no special label, as required by the regulations of the inter-state-commerce commission, indicating that it contained casing-head gasoline. The evidence showed that casing-head gasoline was a much more dangerous substance than ordinary commercial gasoline. The evidence did not show that the defendant carrier knew of the location or the existence of the vulcanizing plant kept by Thomas. The mere fact that it was located near the tracks of the company was not sufficient to put the railroad on notice of its proximity. While the evidence shows that there was a stove in the vulcanizing plant of Thomas, in which a fire was constantly kept, it failed to show that this stove was not kept closed except when opened for the purpose of putting in coal; and the evidence shows that there was no open furnace or open fire maintained in the vulcanizing plant. The distance from the car to the boiler or stove in which Thomas kept this fire does not appear from the evidence. He kept the boiler or stove in the building, which was 30 odd feet long, but what part of the building it was kept in does not appear. The evidence shows that the car was closed, that the carrier thought it contained ordinary commercial gasoline, and that if this had been true there would have been no danger whatever in locating the car where it was placed in the rear of the vulcanizing plant. There was no evidence whatever tending to show that at any time prior to the explosion the tank-car had leaked or had emitted gases or fumes or given any indication of interior pressure or that its contents were vaporizing or seeking avenues of escape; and there was no evidence showing clearly at what time the car had been placed in the rear of the Thomas plant, and the evidence affirma-tively shows that the defendant carrier did not violate any of the regulations of the interstate-commerce commission, and it does not appear that the carrier knew, or could have known by the exercise of

ordinary care, that there had been a violation of the regulations in reference to the casing-head gasoline by the shipper of the gasoline in not placing on the car the special red label indicating the presence of this character of gasoline, all of the labels indicating that it contained ordinary commercial gasoline. The carrier had not delivered the car to the Reed Oil Company, and had not given consent for the Reed Oil Company to open the car for the purpose of taking samples or for any other purpose. There was no evidence indicating that the defendant carrier knew of Hyde's presence on the tank-car, or of his efforts to take samples from it, and, so far as the evidence discloses, there was nothing that tended to show that the defendant carrier, in the exercise of ordinary diligence, could have found out that the Reed Oil Company, before it had notice of the reception of the car and before the car was delivered to it, would send its agent to the car for the purpose of taking samples therefrom, and certainly no evidence of any circumstance showing that if the Reed Oil Company attempted to do so, it would attempt to procure these samples without finding out, through the valves, as required by the regulations of the Interstate Commerce Commission, the condition of the gasoline inside, whether it was vaporizing or whether the pressure was great or dangerous.

After a very careful examination of the evidence, in connection with the allegations of the petition, we think it clear that the plaintiff failed entirely to make out a case of negligence as alleged against the defendant carrier. Entertaining this view, we do not consider it necessary or proper to go into the question of what was the proximate cause of the explosion of the tank-car and the resulting death of the plaintiff's son, as we are informed in the record in this case that the Reed Oil Company, against whom a verdict was rendered, has filed a motion for a new trial.

*Judgment affirmed on the main bill of exceptions; cross-bill dismissed. Stephens, J., concurs specially. Jenkins, P. J., disqualified.*

STEPHENS, J., concurring specially. I concur only in the judgment of affirmance.